UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CELINDA ACEVADO and JACQUELINE
LOPEZ, individually and on behalf of all
others similarly situated,

                         Plaintiffs,

       -against-

CITIBANK, N.A.,

                         Defendant.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 8030 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        In this putative class action, Plaintiffs Celinda Acevado and Jacqueline Lopez

allege that Defendant Citibank, N.A., restrained their bank accounts and charged them fees in

violation of New York's Exempt Income Protection Act.

        Citibank has moved to dismiss the Second Amended Complaint ("SAC") pursuant

to Fed. R. Civ. P. 12(b)(1) and (6), or, in the alternative, to compel arbitration.[1] (Mot. (Dkt. No.

157); Def. Br. (Dkt. No. 165) at 5) Citibank argues, <u>inter alia</u>, that the SAC alleges no theory

under which the amount in controversy exceeds $5 million, as required under the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2), and that in any event Plaintiffs' claims are subject to

binding arbitration and class action waiver. (<u>See</u> Def. Br. (Dkt. No. 165) at 15-23)

        Plaintiffs have moved for leave to file a Third Amended Complaint ("TAC"),

which would add (1) a new representative plaintiff to the action; and (2) certain remedies not

sought in the SAC. (<u>See</u> Mot. (Dkt. No. 152; Pltf. Br. (Dkt. No. 155) at 6-7)

---

[1] The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Filing system.

For the reasons stated below, Defendant's motion to dismiss the Second Amended Complaint will be granted, and Plaintiffs' motion for leave to file a Third Amended Complaint will be denied.

## BACKGROUND

### I. FACTS

#### A. THE EXEMPT INCOME PROTECTION ACT

The New York Legislature passed the Exempt Income Protection Act (the "EIPA") in 2008. (SAC (Dkt. No. 91) ¶ 19) At the time Plaintiffs filed the SAC, the Act prohibited judgment-creditors from placing a restraint on the first $2,100 in a debtor's bank account, regardless of the source of those funds.[2] (Id. (citing C.P.L.R. § 5222(i)) The EIPA also protects up to $2,500 of "'reasonably identifiable' federally exempt benefits payments." (Id. ¶ 20) Where judgment-creditors serve restraining notices on banks concerning accounts that contain an amount equal to or less than 90 percent of the protected amount – or, in the case of federally exempt benefit payments, an amount equal to or less than $2,500 – banks are to deem the restraining notices void. (Id. ¶ 19; C.P.L.R. § § 5222(h)-(i)) Where judgment-creditors attempt to restrain such accounts, or otherwise fail to follow the procedures set out in the EIPA

---

[2] The amount judgment creditors are prohibited from restraining varies with New York's minimum wage. In 2008, when the EIPA was enacted, the amount was $1716. (SAC (Dkt. No. 91) ¶ 19; see also C.P.L.R. § 5222(i) ("A restraining notice issued pursuant to this section shall not apply to an amount equal to or less than the greater of two hundred forty times the federal minimum hourly wage . . . or two hundred forty times the state minimum hourly wage. . . ."). As a result of amendments to New York's minimum wage law – which went into effect on December 31, 2016 and which "raised the minimum wage variably in different parts of [New York] State" and made the minimum wage "variable based on the size of an employer" in New York City – the exempt amount has increased, but varies depending on the accountholder's location and the size of his or her employer. (See April 7, 2017 New York Department of Financial Services Industry Ltr., available at https://www.dfs.ny.gov/docs/legal/industry/il170404.pdf)

for restraining accounts, banks may not charge fees to the account-holder in connection with the attempted restraint. (SAC (Dkt. No. 91) ¶ 19)

**B.** **THE PARTIES**

Plaintiffs are New York residents who maintained bank accounts at Citibank branches in New York City. (Id. ¶¶ 10-11) Citibank is a Delaware corporation. (See id. ¶ 9)

In or about June 2009, Plaintiff Acevado received a notice from Citibank stating that her savings account had been frozen due to a restraining notice and/or levy served on Citibank by non-party judgment creditors. (Id. ¶ 12) At that time, Acevado's Citibank account contained approximately $2,000 in wages she had earned. (Id.) Acevado alleges – "[u]pon information and belief" – that as a result of the restraint, she "could not access any of the funds in her account, either in person, through an automated teller machine, by debit card[,] or by check," and that Citibank charged her administrative fees totaling approximately $100 in connection with the restraint. (Id. ¶ 13)

On or about January 5, 2011, Lopez received a notice from Citibank stating that her checking account had been frozen due to a restraining notice and/or levy served on Citibank by non-party judgment creditors. (Id. ¶ 14) At that time, Lopez's account contained approximately $3,305.60 in wages she had earned. (Id.) Lopez alleges – again, "[u]pon information and belief" – that she "could not access any of the funds in her account, either in person, through an automated teller machine, by debit card[,] or by check," and that Citibank advised her that her funds would be transferred to a Citibank holding account, and charged her an administrative fee of approximately $125 in connection with the restraint. (Id. ¶ 15)

Plaintiffs contend that Citibank violated the EIPA by restraining their accounts and charging them fees in connection with the restraints; moreover, Plaintiffs claim that Citibank

has "unlawfully regularly restrained" similarly situated customers' accounts, "in numerous instances subsequently transferr[ing] the funds to creditors" and "impos[ing] fees and penalties" in "clear violation of the [EIPA's] terms." (Id. ¶ 4)

## II.   PROCEDURAL HISTORY

This case has a lengthy procedural history. Plaintiff Acevado commenced this action on October 21, 2010, alleging essentially the same facts as are outlined above. (See Cmplt. (Dkt. No. 1)) Plaintiff asserted claims for conversion, unjust enrichment, breach of fiduciary duty, negligence, and breach of contract, and sought an injunction enjoining Citibank from engaging in the alleged EIPA violations and requiring Citibank to comply with the EIPA. (Id.) Acevado brought these claims on behalf of a proposed class consisting of all Citibank account holders "who, during the period between January 1, 2009, and the present, had their accounts restrained and/or levied upon . . . despite the fact that the accounts contained funds exempted from restraint and/or levy, and/or contained an amount lower or equal to the statutorily prescribed protected amount from restraint and/or levy." (Id. ¶ 23)

The Amended Complaint was filed on February 14, 2011. (See Am. Cmplt. (Dkt. No. 10)) The Amended Complaint adds Lopez as a representative plaintiff. (Id.) Unlike the Complaint – which states that the Court has jurisdiction pursuant to 28 U.S.C. § 1332 (see Cmplt. (Dkt. No. 1) ¶ 7) – the Amended Complaint invokes federal jurisdiction pursuant to the Class Action Fairness Act (the "CAFA"), alleging that "[u]pon information and belief, the damages of the Class exceed $5,000,000." (Am. Cmplt. (Dkt. No. 10) ¶ 7) The Amended Complaint also adds a cause of action for "violations of the [EIPA]." (Id. ¶¶ 36-43)

On March 23, 2012, this Court dismissed Plaintiffs' (1) common law causes of action, and (2) claim for violations of the EIPA, to the extent that claim sought money damages.

The Court concluded that "there is no express or implied private right of action under the EIPA permitting an account holder to sue his or her bank for money damages related to EIPA violations." See Acevado v. Citibank, N.A., No. 10 Civ. 8030 (PGG), 2012 WL 996902, at *5-15 (S.D.N.Y. Mar. 23, 2012).

On March 20, 2013, this Court dismissed Plaintiffs' claim for injunctive relief pursuant to the EIPA, reasoning that there is no private right of action under the EIPA to seek such relief. See Acevado v. Citibank, N.A., No. 10 Civ. 8030 (PGG), 2013 WL 1149666, at *3-6 (S.D.N.Y. Mar. 20, 2013). Plaintiffs then appealed this Court's dismissal orders. (See Corrected Notice of Appeal (Dkt. No. 52))

The Second Circuit subsequently considered two appeals involving the EIPA. See Cruz v. TD Bank, N.A., 742 F.3d 520 (2d Cir. 2013). In both cases, district courts had granted Rule 12(b)(6) motions to dismiss, finding – as this Court had found – that "judgment debtors do not have a private right of action against their banks for the banks' violation of the EIPA's procedural requirements." Id. at 522. In connection with these appeals, the Second Circuit certified the following questions to the New York Court of Appeals:

> first, whether judgment debtors have a private right of action for money damages and injunctive relief against banks that violate [the] EIPA's procedural requirements; and

> second, whether judgment debtors can seek money damages and injunctive relief against banks that violate [the] EIPA in special proceedings prescribed by Article 52 of the CPLR and, if so, whether those special proceedings are the exclusive mechanism for such relief or whether judgment debtors may also seek relief in a plenary action.

Id.

The New York Court of Appeals answered the first question in the negative, ruling that there is no "private right to bring a plenary action for injunctive relief [or] money

damages" under the EIPA. Cruz v. TD Bank, N.A., 22 N.Y.3d 61, 78 (2013). As to the second question, the court held that a "judgment debtor can secure relief from a bank arising from a violation of the EIPA in a CPLR article 52 special proceeding[.]" Id. The court further ruled that "the statutory mechanisms for relief [under CPLR article 52] are exclusive." Id.

The Court of Appeals explained that, pursuant to CPLR Article 52, where

> a judgment debtor believes that a bank has restrained assets in error in violation of the EIPA – meaning there is a controversy between the bank and the account holder over access or "rights" in the deposited funds – he or she can obtain a civil remedy, such as the release of any money unlawfully restrained, an injunction barring transfer of exempt property to the sheriff or judgment creditor, or reimbursement of any bank fees improperly charged.

Id. at 75-76; see Cruz v. T.D. Bank, N.A., No. 10 Civ. 8026 (PKC), 2014 WL 1569491, at *9 (S.D.N.Y. Apr. 17, 2014) (noting that "[a]vailable remedies . . . do not include punitive or exemplary damages, 'obey-the-law' injunctions, or disgorgement of unjust profits").

After the New York Court of Appeals issued its opinion, the Second Circuit affirmed the judgments of the district courts granting dismissal. See Cruz, 742 F.2d at 522-23. In both cases, however, the Circuit remanded with instructions to permit plaintiffs to move for leave to amend their complaints. Id. at 523.

After the Second Circuit's decision in Cruz, Plaintiffs in the instant action moved for a remand, and asked the Second Circuit to direct this Court to permit them to move for leave to amend. The Second Circuit granted that motion on February 26, 2014. Acevado v. Citibank, N.A., No. 13-1396 (Dkt. No. 55) (2d Cir. Feb. 26, 2014). Plaintiffs subsequently requested that the Court set a briefing schedule for Plaintiffs' anticipated motion for leave to file a Second Amended Complaint. (Dkt. No. 56)

At a May 1, 2014 conference following the Second Circuit's remand, this Court expressed concern – in light of the New York Court of Appeals decision – as to whether the amount in controversy would reach the $5 million threshold under CAFA:

> The Court: [T]he question I have is given how the damages have been limited. Because all I have been told is there are thousands of people. I know there are multiple thousands, but I don't know whether that's two thousand or three thousand. I have no idea. So I know the allegation is there are thousands of individuals who have been affected by this, but given how the damages have been limited, I don't know whether it's going to amount to $5 million or not, and I wanted to flag that as a concern that I have.
>
> Plaintiffs' Counsel: Understood. As I have said, we really may need some discovery, and I guess we will deal with that in due course.
>
> The Court: Yes.

(May 1, 2014 Tr. (Dkt. No. 66) at 10-11) This Court nonetheless granted Plaintiffs permission to move for leave to file a Second Amended Complaint. (Order (Dkt. No. 58))

Plaintiffs filed their motion to amend on August 1, 2014, and submitted a proposed SAC seeking, inter alia, compensatory, statutory, exemplary, and punitive damages, and an injunction "enjoining Defendant from continuing to engage in the unlawful and inequitable conduct alleged herein and requiring Defendant to comply with [the] EIPA." (Mot. (Dkt. No. 73); Koppell Decl., Ex. 1 (Dkt. No. 74-1)) On March 13, 2015, this Court denied Plaintiffs' motion, explaining that "the remedies sought in the proposed SAC go far beyond [those authorized by the New York Court of Appeals, which include only] 'the release of any money unlawfully restrained, an injunction barring transfer of exempt property . . . , or reimbursement of any bank fees improperly charged.'" (March 13, 2015 Mem. Op. & Order (Dkt. No. 81) at 13 (quoting Cruz, 22 N.Y.3d at 76)) However, the Court's denial of Plaintiffs' motion to amend was "without prejudice to . . . a renewed motion founded on a proposed SAC that seeks permissible remedies." (Id.)

On May 21, 2015, Plaintiffs moved for leave to file a revised SAC (see Mot. (Dkt. No. 84)), and this Court granted that motion on September 16, 2015. (Order (Dkt. No. 89))

On September 22, 2015, Plaintiffs filed the SAC. (SAC (Dkt. No. 91)) The SAC asserts two causes of action pursuant to C.P.L.R. § 5239 and C.P.L.R. § 5240, both premised on alleged violations of the EIPA. (Id. ¶¶ 37-53) Plaintiffs bring these claims on behalf of a class defined as

> a) All individual account holders of Defendant who, during the period between January 1, 2009 and the present, had their accounts restrained . . . in violation . . . of the [EIPA] and whose accounts have . . . not been applied by a sheriff or receiver to the satisfaction of a judgment[] (the "5239 Class")
>
> b) All individual account holders of Defendant who, during the period between January 1, 2009 and the present, had their accounts restrained and/or levied upon . . . in violation . . . of the [EIPA][] (the "5240 Class").

(Id. ¶ 25)

For the 5239 Class, Plaintiffs seek "a release of any moneys unlawfully restrained in violation of EIPA"; "a refund of any fees improperly charged by Defendant in violation of EIPA"; and an injunction "[e]njoining the Defendant from transferring any of the 5239 Class['s] moneys that have been unlawfully restrained by the Defendant in violation of [the] EIPA." (Id., ad damnum clause)

For the 5240 Class, Plaintiffs seek "a refund of any fees improperly charged by the Defendant in violation of [the] EIPA." (Id.)

On April 8, 2016, Citibank moved to dismiss the SAC. Inter alia, Citibank argued that this Court lacks subject matter jurisdiction, because Plaintiffs have no "reasonable basis to assert that that the amount in controversy could reach the five million dollar threshold required by CAFA." (Mot. (Dkt. No. 107); Def. Br. (Dkt. No. 112) at 16)

In a March 20, 2017 order, this Court ruled that "the issue of subject matter jurisdiction must be resolved before any other issues in Defendant's motion are addressed," and noted that "it is not clear from the SAC whether the $5 million threshold set forth in CAFA is met." (Order (Dkt. No. 119) at 6, 9) The Court went on to deny Defendant's motion to dismiss without prejudice and ordered the parties to conduct sixty days of jurisdictional discovery. (Id. at 10)

In a November 30, 2017 letter, Plaintiffs informed the Court that they intended to seek permission to file a Third Amended Complaint, because "review of the files provided [by Citibank] and a recent determination by the Appellate Division Second Department establishes that, if given leave to replead the complaint . . . there is sufficient evidence to conclude that well in excess of five-million dollars is at issue in this case." (Nov. 30, 2017 Pltf. Ltr. (Dkt. No. 137) at 1) Plaintiffs explained that jurisdictional discovery "indicated that . . . Defendant aggregated the value of multiple depositor accounts together in order to calculate the exemption amount," a practice the Second Department had "recently ruled . . . violate[s] [the EIPA]." (Id. at 2 (citing Jackson v. Bank of America, 149 A.D.3d 815 (2d Dept. 2017)) Plaintiffs stated that the proposed Third Amended Complaint would add a representative plaintiff whose accounts had been aggregated impermissibly, and would seek "damages from the unlawful aggregation of depositors' accounts prior to calculating EIPA exemptions, resulting in the deprivation of exempt property from depositors." (Id. at 1)

After multiple discovery disputes and extensions of the jurisdictional discovery deadline, the parties completed jurisdictional discovery. Plaintiffs then moved for leave to file a third amended complaint ("TAC"), while Defendant moved to dismiss the SAC. (Mot. (Dkt. No. 152); Mot. (Dkt. No. 157))

# DISCUSSION

## I.    MOTION TO DISMISS

### A.    Subject Matter Jurisdiction

#### 1.   Applicable Law

Plaintiffs assert that this Court has subject matter jurisdiction under the Class

Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), which provides that

> [t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—
>
> (A) any member of a class of plaintiffs is a citizen of a State different from any defendant[.]

28 U.S.C. § 1332(d)(2). CAFA permits aggregation of the claims of individual class members to

reach the jurisdictional amount. See 28 U.S.C. § 1332(d)(6) ("In any class action, the claims of

the individual class members shall be aggregated to determine whether the matter in controversy

exceeds the sum or value of $5,000,000, exclusive of interest and costs.").

"'Determining the existence of subject matter jurisdiction is a threshold inquiry[,]

and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it.'" Morrison v.

Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (quoting Arar v. Ashcroft, 532 F.3d

157, 168 (2d Cir. 2008)), aff'd, 561 U.S. 247 (2010). "In reviewing a motion to dismiss under

Rule 12(b)(1), the court 'must accept as true all material factual allegations in the complaint, but

[it is] not to draw inferences from the complaint favorable to Plaintiffs.'" Wood v. Gen. Motors

Corp., No. 08 Civ. 5224 (JFB) (AKT), 2010 WL 3613812, at *3 (E.D.N.Y. Aug. 23, 2010)

(quoting Toomer v. Cty. of Nassau, 07 Civ. 01495 (JFB) (ETB), 2009 WL 1269946, at *3

(E.D.N.Y. May 5, 2009)).

"On a motion to dismiss challenging the sufficiency of the amount in controversy, the sum claimed by the plaintiff ordinarily controls, so long as it is claimed in good faith." Stengel v. Black, No. 03 Civ. 0495 (GEL), 2004 WL 1933612, at *1 (S.D.N.Y. Aug.30, 2004) (citing St. Paul Mercury Indem., Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)). Generally, "[a] suit may not be dismissed for lack of the jurisdictional amount in controversy unless it appears 'to a legal certainty' that the plaintiff cannot recover the amount claimed." Id. (quoting St. Paul, 303 U.S. at 289); see also Aros v. United Rentals, Inc., No. 3:10 Civ. 73 (JCH), 2011 WL 1647471, at *2 (D. Conn. Apr. 25, 2011) (applying "legal certainty" standard in a class action under CAFA).

In resolving "disputed jurisdictional factual issues," a court may "reference . . . evidence outside the pleadings. The Court may decide the matter on the basis of affidavits or other evidence, but 'argumentative inferences favorable to the party asserting jurisdiction should not be drawn.'" Commer v. McEntee, No. 00 Civ. 7913 (RWS), 2006 WL 3262494, at *8 (S.D.N.Y. Nov. 9, 2006) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992) (internal citations omitted)). Moreover, "'[w]here . . . jurisdictional facts are challenged, the party asserting jurisdiction must support those facts with competent proof and justify its allegations by a preponderance of the evidence.'" Lapaglia v. Transamerica Cas. Ins. Co., 155 F. Supp. 3d 153, 157 (D. Conn. 2016) (quoting United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 305 (2d Cir. 1994)); Pang v. Allstate Ins. Co., No. 97 Civ. 4971 (WK), 1998 WL 190291, at *2 (S.D.N.Y. Apr. 21, 1998) (plaintiff's satisfaction of amount in controversy requirement hinged primarily on punitive damages claim; dismissal granted because plaintiff had not demonstrated a "reasonable probability" that his claim for punitive damages was viable), aff'd, 173 F.3d 845 (2d

Cir. 1999); see also McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936) ("If [the plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof." ); Thomson v. Gaskill, 315 U.S. 442, 446 (1942) (citing McNutt, and explaining that a complaint "must be dismissed if the evidence in the record does not support the allegations as to jurisdictional amount").[3]

## 2.    **Available Remedies**

As the New York Court of Appeals explained, "if a judgment debtor believes that a bank has restrained assets in error in violation of the EIPA – meaning there is a controversy between the bank and the account holder over the access or 'rights' in the deposited funds – he or she can obtain a civil remedy, such as the release of any money unlawfully restrained, an injunction barring transfer of exempt property to the . . . judgment creditor, or reimbursement of any bank fees improperly charged" pursuant to C.P.L.R. § 5239. Cruz, 22 N.Y.3d at 75-76. C.P.L.R. § 5240 permits "[c]omparable relief[,] . . . even after the assets have been transferred to the judgment creditor," but such relief is available only against the judgment creditor, and not against the judgment debtor's bank. See id. at 76; see also Cruz, 2014 WL 1569491, at *9 ("[W]here there has been a transfer of funds by a bank to a judgment creditor which includes improperly restrained exempt property, the judgment debtor's remedy is against the judgment creditor and not the garnishee-bank.") "Each of the three forms of relief cited by the New York

---

[3] One court has observed that "although the plausibility requirement is most commonly applied in the context of evaluating whether a complaint substantively states a claim for relief, there is little reason to suppose that it should not equally govern the evaluation of factual allegations that support federal subject matter jurisdiction, such as to evaluate facts alleged concerning an amount in controversy for purposes of federal diversity jurisdiction." Lapaglia, 155 F. Supp. 3d at 155) (citing Wood v. Maguire Automotive, LLC, 508 Fed. Appx. 65, 65 (2d Cir. 2013) (affirming dismissal of complaint for lack of subject matter jurisdiction where plaintiff's "allegation in her complaint of $75,000 in controversy is conclusory and not entitled to a presumption of truth").

Court of Appeals is remedial in nature, aimed at undoing the effects of an improper account garnishment and restoring a judgment debtor to the position in which he or she would have been had the wrongful garnishment never taken place." Cruz, 2014 WL 1569491, at *8.

### 3.   Evidence Obtained Through Jurisdictional Discovery

In a June 9, 2017 joint letter, the parties informed the Court that they had agreed upon a process for jurisdictional discovery. (See June 9, 2017 Jt. Ltr. (Dkt. No. 122)) Citibank reported that – in response to restraining notices obtained under New York law – it had effected a restraint in 27,666[4] cases between 2009 and September 22, 2015 – the date the SAC was filed. Recognizing that this figure is too large to permit review of each individual case, the parties agreed that Professor Merrill Leichty of Drexel University – a statistics expert retained to advise Citibank – would generate a sample from which data about the amount in controversy could be extrapolated. (Id.) Per the parties' agreement, Professor Liechty manually reviewed 554 of the 27,666 restraint files. Citibank provided Plaintiffs with the results of that review, including: (1) the date service of the restraint notice was received; (2) the case number; (3) whether the EIPA was applicable to the restraint; (4) the applicable exemption at the time the restraint notice was served; (5) the amount Citibank collected in fees related to the restraint; (6) the amount of any fee reversal; and (7) the date the file was closed. (Aug. 23, 2017 Def. Ltr. (Dkt. No. 129)) Citibank also provided Plaintiffs with 185 of the actual restraint files from the 554-file sample. (Id.)

Citibank's account of the results of jurisdictional discovery is set out in the declarations of Professor Liechty and various Citibank employees, and is supported by numerous

---

[4]  The June 9, 2017 joint letter refers to "approximately 27,665" cases.  The exact number is 27,666.  (See June 9, 2017 Jt. Ltr. (Dkt. No. 122); Wagner Decl. (Dkt. No. 159) ¶ 14)

spreadsheets listing the relevant restrained accounts and the fees imposed. Polly Wagner, Citibank's Senior Vice President for Legal Operations, explains that "from January 1, 2009 to September 22, 2015, Citibank opened . . . a total of 27,666 [r]estraint [f]iles." (Wagner Decl. (Dkt. No. 159) ¶ 14) Restraint files typically contain "the restraining notice, other documentation received from the judgment creditor, the case card, financial posting, exemption claims, a decision calculator, correspondence with the judgment creditor or account holder, copies of releases, turnover orders and/or executions."[5] (Id. ¶ 18) The 27,666 restraint files opened during this period "are, with perhaps few, if any, exceptions[,] now closed." (Id. ¶ 11)

Professor Liechty explains that Citibank informed him that of the 554 restraint files in the sample he analyzed, a fee was charged in 370 cases[6] – an amount that corresponds to 66.787 percent of the files. (Liechty Decl. (Dkt. No. 158) ¶ 24) Applying that percentage, Liechty concluded that – of the total 27,666 files restrained – fees were imposed in 18,478 cases. After application of the parties' agreed-upon margin for error, the number could be as few as 17,393 or as many as 19,653 files. (Id. ¶¶ 25-26)

Wagner explains that in the 370 files in which a fee was imposed, the average amount collected was $122.76. Applying this figure to the 18,478 files Liechty determined were

---

[5] The "case card" provides, inter alia, "an audit trail of when the case was opened[] [and] closed." (Wagner Decl. (Dkt. No. 159) ¶ 18) The "financial posting" consists of "sheets [that] help identify the [f]ee collected and the amount segregated towards the judgment at the time of service." (Id.)
[6] Wagner explains that "these 370 cases include those in which one or more of the judgment debtor's account(s) were partially blocked (frozen) and those in which no account was blocked." (Wagner Decl. (Dkt. No. 159) ¶ 24) A judgment-debtor's account would not be restrained if, for example, the account "contains [an] amount in excess of the sum of the exempt amount, twice the amount of the judgment[,] and the restraint fee." (Id. ¶ 24)

restrained and in which a fee was charged, Wagner concludes that Citibank collected approximately $2,268,359.28 in restraint fees.[7] (Wagner Decl. (Dkt. No. 159) ¶¶ 25-26)

Citibank further determined that some restraints resulted in the imposition of additional, non-restraint fees; for the 258 files for which such non-restraint fees were imposed, the average fee was $10.11. (Green Decl. (Dkt. No. 162) ¶ 13) Applying that sum to all 18,478 estimated restrained files, these non-restraint fees total $186,812.58. (Id. ¶ 17) Citibank estimates that the restraint and non-restraint fees – once totaled – amount to $2,455,171.86. (Id. ¶ 18) Citibank's calculations and analyses are set forth in spreadsheets submitted to Plaintiff and the Court. (See, e.g., id., Exs. 31-32 (fee calculations) (Dkt. Nos. 162-5, 162-6); Wagner Decl., Exs. 4-6 (restraint file spreadsheets) (Dkt. Nos. 159-1 to 159-4); Chellappa Decl., Ex. 16 (spreadsheet of restraint files in which an account was restrained) (Dkt. No. 160-1))

Citibank further determined that – in response to restraining notices obtained under New York law between September 23, 2015 and December 31, 2017 – Citibank opened 6,552 restraint files. (Green Decl. (Dkt. No. 162) ¶ 19, Ex. 33; Wagner Decl. (Dkt. No. 159) ¶ 28)[8] Citibank calculates that the total sum of restraint and non-restraint fees imposed with respect to these files is $581,439.12 (Green Decl. (Dkt. No. 162) ¶ 19, Ex. 33) When combined with the fees imposed since 2009, the total sum of fees imposed pursuant to restraints amounts to $3,026,610.98.

---

[7] After application of the parties' agreed upon margin for error, Citibank could have charged as much as $2,412.602.28 in restraint fees, or as little as $2,135,164.68.

[8] The Wagner Declaration states that Citibank opened 1,276 restraint files between September 23, 2015 and December 31, 2015; 3,014 restraint files in 2016; and 2,262 restraint files in 2017. (Wagner Decl. (Dkt. No. 159) ¶ 28) The sum of these numbers is 6,552. The Wagner Declaration states that sum of these restraint files is 6,197; this appears to be an arithmetic error. Exhibit 33 to the Green Declaration reports the correct figure, and calculates that fees of $581,439.12 were imposed between September 23, 2015 and December 31, 2017, based on that figure. (Green Decl. (Dkt. No. 162) ¶ 19, Ex. 33)

Plaintiffs' understanding of the results of jurisdictional discovery is set out in the declaration of Ian Engoron. When Engoron conducted his analysis of the jurisdictional discovery, he was a third-year law student and law clerk employed by Plaintiffs' counsel. (See Engoron Decl. (Dkt. No. 154) ¶¶ 1, 3) Plaintiffs did not provide the Court with the work papers and spreadsheets that presumably underlie or reflect Engoron's calculations.

Engoron reviewed the spreadsheet Citibank created describing the 554 files Citibank analyzed, as well as the 184 actual files Citibank produced. From this information, Engoron compiled his own spreadsheet, and extrapolated the information reflected in these files to the full number of restraints filed during the class period.[9] (Id. ¶ 6) Engoron's extrapolations are based only on the 185 actual files he reviewed, rather than the information reflected in the 554-sample Citibank spreadsheet. (See Pltf. Reply Br. (Dkt. No. 156) at 9 n. 1)

Engoron's calculation of the total amount of restraint and non-restraint fees imposed between 2009 and September 22, 2015 differs slightly from Citibank's calculation. With respect to restraint fees, Engoron concludes that Citibank charged $2,330,500 in "full restraint fees" and $103,078.92 in partial restraint fees, for a total of $2,433,578.92 in restraint fees. (Id. ¶ 8) Engoron further determined that Citibank imposed approximately $119,260.07 in non-restraint fees on the class members during this period. (Id. ¶ 10) According to Engoron, the restraint and non-restraint fees total approximately $2,552,839.

---

[9] Plaintiffs rely on a total number of 27,374 restraint files, rather than the 27,666 restraint files cited in Citibank's submissions. According to Plaintiffs, Citibank "inadvertently omitted a list of 292 Restraint Files for restraints effected during the three-month period June 22, 2015 through September 22, 2015" when sending Professor Liechty spreadsheets of all the relevant files. Liechty maintains that "[t]he absence of these 292 cases (1% of the total) from the universe of cases from which the sample was selected has no material effect on the sampling or the conclusions that should be drawn from it." (Liechty Decl. (Dkt. No. 158) ¶ 23)

Engoron further extrapolated the amount of restraint and non-restraint fees for the period between September 23, 2015 and December 31, 2017. Engoron determined that, during this period, Citibank imposed an additional $776,875 in full restraint fees; $34,344.78 in partial restraint fees; and $39,757.32 in non-restraint fees – for a total of an additional $850,977.10.[10] (Id. ¶¶ 9, 11) When added to the fees imposed between 2009 and September 22, 2015, the total sum of restraint and non-restraint fees Engoron computes is $3,403,816.09. (See id. ¶ 10)

Engoron also performed calculations concerning a component of damages not addressed by Citibank. This category of damages concerns Citibank's alleged aggregation of account holders' accounts. Engoron reported that the 185 files he had reviewed "revealed that for 56 account holders [Citibank had] improperly aggregated their accounts and improperly restrained $37,054.37." Extrapolating this figure to all restrained files between 2009 and September 22, 2015, Engoron "calculated that $5,482,844.99 in monies were improperly aggregated and restrained by the Bank." (Id. ¶ 11) Extrapolating further, to December 31, 2017, Engoron surmises that "an additional $1,827,587.78 was likely improperly aggregated and

---

[10] Engoron's figure of $850,977.10 is much greater than Citibank's corresponding calculation of $581,439.12. The difference stems from estimates Engoron made concerning the number of restraint files opened between September 23, 2015 and December 31, 2017. As discussed above, Citibank determined that it opened 6,552 restraint files pursuant to receipt of restraining notices between September 23, 2015 and December 31, 2017. This is an actual number, not an estimate. Rather than use this actual number, Engoron estimated – based on the number of files produced during the sample period of 2009 to September 22, 2015, "that approximately 4,055 new restraint files were opened per year, or 338 files per month." (Engoron Decl. (Dkt. No. 154) ¶ 9) Accordingly, while Engoron estimated that 4,055 restraint files were opened per year between September 23, 2015 and December 31, 2017, the actual number of restraint files opened during that entire period was 6,552. Engoron's inflated estimate of the number of restraint files opened between September 23, 2015 and December 31, 2017 leads to a correspondingly inflated fee amount for this period.

restrained [by the] Bank," totaling "in excess of seven[]million three hundred thousand dollars combined." (Id.)[11]

## 4.  **Analysis**

Citibank argues that jurisdictional discovery has revealed that Plaintiffs cannot satisfy the $5 million amount-in-controversy requirement for jurisdiction pursuant to CAFA. According to Citibank, "as of September 22, 201[5], the total amount of fees collected by Citibank was $2,455,171.86, less than half of the jurisdictional threshold." Even if fees collected after the filing of the SAC are considered, the $5 million threshold would not be met.[12] (See Def. Br. (Dkt. No. 165) at 16, 29 n.11 (emphasis in original)) Citibank further maintains that "Plaintiffs cannot seek to use a demand for injunctive relief, with an entirely unspecified value, to add value to litigation that is otherwise millions of dollars below the CAFA monetary threshold." (Id. at 17)

Plaintiffs contend that – as of December 2017 – they have alleged "more than three million dollars in estimated fees charged by [Citibank]," and "more than seven million dollars in monies improperly restrained by [Citibank] when it chose to improperly aggregate debtors['] accounts together in calculating the exempt amount." Were damages to be calculated as of September 22, 2015, Plaintiffs contend that they have shown "more than two million five

---

[11] Engoron does not explain how he arrived at this figure, and Plaintiffs have provided no documents supporting his calculations. In any event, as discussed below, the only relief Plaintiffs may recover as a result of improper aggregation is the "release of any money unlawfully restrained" as a result of such aggregation, and there is no evidence that Citibank is currently holding any such funds.

[12] Citibank contends that, in any event, amount in controversy may only be calculated as of the filing of the Complaint in 2010. (See Def. Br. (Dkt. No. 165) at 15-16) Since – as discussed below – the outcome of the instant motions does not turn on this question, the Court does not reach it.

hundred thousand dollars in fee damages and approximately five[]million five hundred thousand dollars in aggregation damages." (Pltf. Reply Br. (Dkt. No. 156) at 9-10 (citation omitted))

### a.  "Aggregation" Damages

The SAC does not allege that Defendants impermissibly aggregated Plaintiffs' accounts, but Plaintiffs seek to add such a claim in their proposed Third Amended Complaint. (Nov. 30, 2017 Pltf. Ltr. (Dkt. No. 137))

In Jackson v. Bank of Am., N.A., 149 A.D.3d 815 (2d Dept. 2017), an EIPA class action, plaintiffs claimed that when restraining notices were sent to the defendant bank, the bank improperly aggregated the account holders' checking and savings accounts. The Second Department affirmed a trial court's denial of the bank's motion to dismiss, concluding that while the law "is ambiguous as to whether it applies to an 'amount' on deposit at a bank or to each 'account' maintained at a bank," the legislative history "indicates that the statute applies to each account." Jackson, 149 A.D.3d at 821.

This court is aware of no other New York court that has addressed the question of whether banks may aggregate accounts before determining what funds are exempt under the EIPA. Accordingly, this Court assumes – for purposes of resolving the pending motions – that the EIPA forbids the aggregation of accounts for purposes of determining the exempt amount. See Cornejo v. Bell, 592 F.3d 121, 130 (2d Cir. 2010) (federal courts are "bound 'to apply the law as interpreted by New York's intermediate appellate courts . . . [absent] persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion'") (quoting Pahuta v. Massey-Ferguson 170 F.3d 125, 134 (2d Cir. 1999))); see also Comm'r v. Bosch's Estate, 387 U.S. 456, 465 (1967) ("[T]his Court [has] held that 'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is

convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting West v. American Tel. & Tel. Co., 311 U.S. 223 (1940))). The Court addresses below whether Plaintiffs can meet the $5 million CAFA threshold on the basis of the "approximately seven million dollars" in aggregation damages Plaintiffs assert exist as of December 2017, or the "approximately five[]million five hundred thousand dollars in aggregation damages" Plaintiffs assert existed as of September 22, 2015. (Pltf. Reply Br. (Dkt. No. 156) at 9-10)

As an initial matter, in the event that Plaintiffs' accounts were improperly aggregated, Plaintiffs are entitled only to "release of any money unlawfully restrained" as a result of such aggregation. Such funds must currently be restrained by Citibank to be recoverable: if money restrained in the past has since been transferred to a third-party judgment creditor, the New York Court of Appeals has made clear that Plaintiffs' avenue for relief is to sue that judgment creditor, and not the bank. See Cruz, 2014 WL 1569491, at *9. Plaintiffs are likewise not entitled to damages for unlawfully restrained funds that Citibank already has returned to them, because the relief available pursuant to C.P.L.R. 5239 and 5340 is merely "remedial in nature, aimed at undoing the effects of an improper account garnishment and restoring a judgment debtor to the position in which he or she would have been had the wrongful garnishment never taken place." Id. at *8. Here, there is no evidence that Citibank presently is restraining any of the improperly aggregated funds of class members.

Indeed, the only evidence Plaintiffs offer as to the value of the funds that were restrained pursuant to unlawful aggregation is the following statement from the Engoron Declaration:

> Above and beyond [restraint and non-restraint] fees, the 185 files [Engoron reviewed] revealed that for 56 account holders the Bank improperly aggregated their accounts and improperly restrained $37,054.37. Extrapolating that for 27,374 individuals, [Engoron] calculated that $5,482,844.99 in monies were

improperly aggregated and restrained by the Bank through September 22, 2015. Extrapolating further through December 2017, an additional $1,827,587.78 was likely improperly aggregated and restrained [by the] Bank. These improperly restrained monies total in excess of seven-million three hundred thousand dollars combined.

(Engeron Decl. (Dkt. No. 154) ¶ 11)

The figures cited by Engoron reflect his estimate of all funds restrained by Citibank between 2009 and 2017 as the result of improper aggregation. But what matters for purposes of the amount in controversy issue is the amount of funds Citibank continues to restrain.[13] Plaintiff provides no estimate of this amount, but Citibank has provided evidence suggesting that the amount of funds currently being held by Citibank is quite low. In her declaration, Wagner asserts that the 27,666 restraint files opened during this period "are, with perhaps few, if any, exceptions[,] now closed." (Wagner Decl. (Dkt. No. 159) ¶ 11)

Because Plaintiffs have offered no evidence that Citibank now holds in restraint improperly aggregated funds that may be released to Plaintiffs as a result of this litigation – much less proof that the sum currently restrained amounts to millions of dollars – this Court will not consider "aggregation damages" in determining whether Plaintiffs can satisfy the CAFA amount-in-controversy threshold.

---

[13] In their November 30, 2017 letter, Plaintiffs acknowledge that the total amount of funds restrained since 2009 due to improper aggregation is not the proper amount to consider for purposes of determining amount-in-controversy. After asserting that approximately $5,480,000 was unlawfully restrained as a result of aggregation between 2009 and September 22, 2015, Plaintiffs note that "[t]o the extent some of the improperly aggregated money may subsequently have been returned to the depositors, this number may have to be somewhat reduced." (Nov. 30, 2017 Pltf. Ltr. (Dkt. No. 137) at 2 n.1) Plaintiffs have made no such reduction, however, and contend that this Court should look to the $5,480,000 figure that they previously conceded was inflated.

**b.     Damages for Injunctive Relief**

The SAC seeks an injunction "[e]njoining the Defendant from transferring any of the 5239 Class[]'s moneys that have been unlawfully restrained by the Defendant in violation of [the] EIPA." (SAC (Dkt. No. 91) ad damnum clause). Plaintiffs contend that "the value of the injunctive relief sought [in the SAC] substantially increases th[e] amount [in controversy]." (Pltf. Reply Br. (Dkt. No. 156) at 12) Citibank, by contrast, argues that the value of the proposed injunctive relief is speculative, and contends that "Plaintiffs cannot seek to use a demand for injunctive relief, with an entirely unspecified value, to add value to litigation that is otherwise millions of dollars below the CAFA monetary threshold." (Def. Br. (Dkt. No. 165) at 17)

"'In actions seeking . . . injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.'" Correspondent Servs. Corp. v. First Equities Corp. of Fla., 442 F.3d 767, 769 (2d Cir. 2006) (quoting Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 347 (1977)). "Because that amount is measured from the plaintiff's perspective, the value of the requested relief is the monetary value of the benefit that would flow to the plaintiff if injunctive . . . relief were granted." Am. Standard, Inc. v. Oakfabco, Inc., 498 F. Supp. 2d 711, 717 (S.D.N.Y. 2007) (citation omitted); see also Correspondent Servs. Corp., 442 F.3d at 769 ("We have observed that 'the amount in controversy is calculated from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy. . . .'" (quoting Kheel v. Port of New York Auth., 457 F.2d 46, 49 (2d Cir. 1972))); Parker v. Riggio, No. 10 Civ. 9504 (LLS), 2012 WL 3240837, at *7 (S.D.N.Y. Aug. 6, 2012) ("'[T]he prevailing method of calculating value [of injunctive relief] in this Circuit is the "plaintiff's viewpoint" approach, where one calculates the value to the plaintiff, not the cost to

the defendant.'" (quoting <u>Dimich v. Med-Pro, Inc.</u>, 304 F. Supp. 2d 517, 519) (S.D.N.Y. 2004)))

"Benefits from an injunction must not be 'too speculative and immeasurable,'" however.

<u>Dimich</u>, 304 F. Supp. at 519 (quoting <u>Morrison v. Allstate Indemnity Co.</u>, 228 F.3d 1255, 1268-

69 (11th Cir. 2000)); <u>see also</u> <u>Parker v. Riggio</u>, No. 10 Civ. 9504 (LLS), 2012 WL 3240837, at

*7 (S.D.N.Y. Aug. 6, 2012) (same).

 Here, Plaintiffs do not offer evidence – or even hazard a guess – as to the value of

the injunctive relief they seek. Indeed, Plaintiffs' only response to Citibank's argument that the

value of injunctive relief is speculative is the following assertion:

> [H]ad the Bank complied with [the] EIPA from 2009 through the end of 2017,
> more than ten million dollars would have been retained by class members. This
> averages to more than one million dollars per year in value if the injunctive relief
> is obtained going forward. Moreover, the value for class members to have access
> to their exempt monies . . . is also substantial, even if such value cannot be readily
> quantified.

(Pltf. Reply Br. (Dkt. No. 156) at 11-12) This argument is confusing at best, and misleading at

worst.

 As an initial matter, it is not clear how a prospective injunction barring Citibank

"from transferring any of the 5239 Class[]'s moneys that have been unlawfully restrained by the

Defendant in violation of EIPA" would provide any quantifiable benefit to Plaintiffs: such an

injunction would not put unlawfully restrained funds back in the hands of Plaintiffs.

 To the extent that Plaintiffs claim that the requested injunctive relief represents a

$10 million benefit to the class, that calculation is based on a combination of the restraint and

non-restraint fees imposed (which Plaintiffs estimate amounts to $3,403,816.09, or roughly

$378,202 per year) and the amounts restrained as a result of improper aggregation. As discussed

above, however, Plaintiffs' aggregation figures reflect all funds ever restrained by Citibank

during the class period; they do not reflect the funds Citibank currently has restrained but has not

yet transferred to a third party judgment-creditor. Plaintiffs have offered no evidence as to the number of accounts currently restrained, or how much money is held in those accounts.

As for "the value for class members to have access to their exempt monies," this argument is not relevant to the SAC, which does not seek injunctive relief concerning access to exempt funds.[14]

Because Plaintiffs have not offered any evidence demonstrating the value of the injunctive relief requested in the SAC – and indeed, have not offered any estimate as to the value of the injunctive relief sought in the SAC – the Court will not consider the value of injunctive relief in determining whether the amount in controversy threshold has been reached.

Without "aggregation damages" or value associated with injunctive relief, Plaintiffs are left only with their restraint and non-restraint fees, which they agree fall far short of $5 million. The Court concludes that Plaintiffs cannot satisfy the amount in controversy requirement, and accordingly grants Defendant's motion to dismiss the SAC for lack of subject matter jurisdiction.

## II.    MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

### A.    Legal Standard

Under the Federal Rules of Civil Procedure, leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). District courts "ha[ve] broad discretion to decide whether to grant leave to amend." Floyd v. City of New York, No. 16 Civ. 8655 (LAP), 2018 WL 4360773, at *4 (S.D.N.Y. Aug. 2, 2018) (internal quotation marks and

---

[14] This argument is relevant to the proposed TAC, which seeks an order "[e]njoining the Defendant from limiting class members' access to exempt funds . . . and requir[es] the Defendant to give judgment debtors[] access to exempt amounts in their accounts in the same manner as any account holder enjoys. . . ." (Proposed TAC (Dkt. No. 153-1) ad damnum clause). Accordingly, the Court addresses this argument below, in connection with Plaintiffs' motion to amend.

citation omitted). Leave to amend may properly be denied in cases of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir.2007) (internal quotation marks and citation omitted). "[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir.1999).

### B.   **Analysis**

#### 1.   **Futility**

This litigation is now in its ninth year, and it has not yet proceeded past the motion to dismiss stage. Plaintiffs' ability to meet the requisite amount in controversy threshold has been at issue throughout. (See Def. Br. (Dkt. No. 20) at 18-19 ("The Amended Complaint contains only the inadequate and erroneous conclusory allegation that the amount in controversy exceeds $5 million. . . . There is no factual basis to support any contention that the amount in controversy in the aggregate is $5 million."); Def. Br. (Dkt. No. 112) at 16 ) ("The limited nature of the relief available to Plaintiffs precludes any reasonable basis to assert that the amount in controversy could reach the five million dollar threshold required by CAFA."); Def. Br. (Dkt. No. 165) at 16 ("[Jurisdictional] [d]iscovery has established that . . . as of September 22, 2018, the total amount of fees collected by Citibank was . . . less than half of the jurisdictional threshold." (emphasis in original)))

The passage of time has worked to Plaintiffs' advantage with respect to the amount in controversy requirement. The class period initially covered only 2009 and 2010, but

now encompasses more than a decade's worth of conduct. (See, e.g., Pltf. Reply Br. (Dkt. No. 156) at 8-9 ("The proposed class goes far beyond the date of the filing of the initial complaint, and, in fact, continues until this very day. . . . As membership in the class continues to grow because of the Bank's ongoing misconduct, the amount in controversy should not be limited to the date of the initial filing. . . .")) Even so, Plaintiffs have not yet come close to demonstrating that they can meet the CAFA threshold.

Plaintiffs argue that – whatever the deficiencies in their earlier complaints – the proposed TAC "addresses the stated concerns of this Court that the five-million-dollar Class Action Fairness Act ('CAFA') threshold cannot be met in this action." (Pltf. Br. (Dkt. No. 155) at 3) In support of this argument, Plaintiffs assert that the proposed TAC (1) "brings the class period forward to the present day"; (2) "includes additional claims for damages due to defendant Citibank N.A.'s . . . unlawful conduct in aggregating the monies in judgment debtors' accounts prior to calculating exempt and restrained amounts"; and (3) "includes narrowly tailored requests for injunctive relief designed to stop the unlawful aggregation process and improve access to exempt amounts in judgment debtors' accounts, as well as returning any funds erroneously restrained and/or turned over to creditors."[15] (Id.)

The Court has already addressed Plaintiffs' first two points. Even assuming arguendo that the class damages should be calculated through the present day, Plaintiffs' calculation of restraint and non-restraint fees does not amount to $5 million. Moreover,

---

[15] The proposed TAC seeks an order "[r]equiring Defendant to return unlawfully turned over exempt monies to members of the 5240 Class." (Proposed TAC (Dkt. No. 153-1) ad damnum clause) As noted above, "where there has been a transfer of funds by a bank to a judgment creditor which includes improperly restrained exempt property, the judgment debtor's remedy is against the judgment creditor and not the garnishee-bank." Cruz, 2014 WL 1569491, at *9. Accordingly, Plaintiffs may not obtain such relief against Citibank.

Plaintiffs have not offered any evidence as to the amount of improperly aggregated funds that currently remain restrained.

As for the "narrowly tailored requests for injunctive relief" Plaintiffs reference, the proposed TAC seeks orders (1) "[e]njoining the Defendant from limiting class members' access to exempt funds to in-person withdrawals from the Defendant and requiring the Defendant to give judgment debtors' access to exempt amounts in their accounts in the same manner as any account holder enjoys"; and (2) "[e]njoining the Defendant from aggregating all of the monies in class members' accounts prior to calculating restrained and exempt amounts." (Proposed TAC (Dkt. No. 153-1) ad damnum clause). The Court concludes that Plaintiffs have not offered a sufficient basis to find that the value of such relief would satisfy the amount in controversy requirement.

As discussed above, "the value of the requested [injunctive] relief is the monetary value of the benefit that would flow to the plaintiff if injunctive . . . relief were granted," Am. Standard, Inc. v. Oakfabco, Inc., 498 F. Supp. 2d 711, 717 (S.D.N.Y. 2007) (citation omitted), and the value of such relief "must not be too speculative and immeasurable," Dimich, 304 F. Supp. at 519 (internal quotation marks and citation omitted). Here, Plaintiffs merely argue that "[w]hile the precise value of this injunctive relief cannot be calculated at this juncture, given the moneys at issue discussed above[,] this relief too will add substantial value to the object of this litigation." (Pltf. Br. (Dkt. No. 155) at 11) In short, Plaintiffs have offered no more than speculation as to the value of the benefit to the class of the injunctive relief sought in the proposed TAC.

Even if the value of the injunctive relief sought by Plaintiffs was not entirely speculative, the proposed injunctions go beyond those remedies authorized by the New York

Court of Appeals, and thus are not available to Plaintiffs. As this Court has stated, "'[a]vailable remedies under Section 5239 do not include . . . 'obey the law' injunctions. . . .'" (March 13, 2015 Mem. Op. & Order (Dkt. No. 81) at 9 (quoting Cruz, 22 N.Y.3d at 76)) But the injunctive relief Plaintiffs seek in the proposed TAC is impermissible "obey-the-law" injunctions that would simply direct Citibank to comply with Plaintiffs' interpretation of the EIPA's requirements. Accordingly, the value of such relief – whatever it may be – cannot be considered in determining whether Plaintiffs can meet the amount in controversy threshold.

Because Plaintiffs are "unable to demonstrate that [they] would be able to amend [their] complaint in a manner which would survive dismissal," Hayden v. County of Nassau, 180 F.3d at 53, Plaintiffs' motion for leave to file a Third Amended Complaint will be denied.[16]

---

[16] Even if amendment were not futile, this Court would deny Plaintiffs' motion to amend on the basis of undue prejudice to Defendant. In Cruz v. T.D. Bank, N.A., No. 10 Civ. 8026 (PKC), 2016 WL 3162120, at *2 (S.D.N.Y. June 3, 2016), Judge Castel denied Plaintiffs' motion for leave to amend, explaining:

> If the six-year history of this case serves even as partial prologue to the length and complexity of the litigation that would ensue from injecting two new legal theories into this action, resolution of any plaintiffs' claims will be substantially delayed. The legal issues already presented by plaintiff have caused an appeal to the Second Circuit and the certification of two questions to the New York Court of Appeals as well as motions to reconsider, amend, and vacate judgment, and plaintiff has yet to file his motion for class certification. Plaintiff's further amendment of the pleadings at this point would significantly prejudice defendant and, perhaps even more so, the purported class members whose sought after relief would be, at best, distant and remote.

Judge Castel's reasoning applies with equal force here. During eight and a half years of litigation, this case has repeatedly stalled at the motion to dismiss phase. As a result of numerous extensions requested by the parties, the 60-day, limited jurisdictional discovery this Court envisioned on March 20, 2017 took four times as long to complete. As in Cruz, Plaintiffs' proposed TAC "inject[s] two new legal theories into this action" – namely, impermissible aggregation of funds and impermissible limitations on Plaintiffs' access to exempt funds – both of which will undoubtedly require substantial additional briefing on questions of New York law, about which there is precious little authority. The Court concludes that further amendment would cause undue prejudice both to Citibank and to the putative class members.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Second Amended Complaint is granted, and Plaintiffs' motion to for leave to file a Third Amended Complaint is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 152, 157) and to close this case.

Dated: New York, New York
       March 31, 2019

SO ORDERED

Paul G. Gardephe
United States District Judge